## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

UNITED COMMUNICATIONS            Case No. 1:09-cv-478
CORPORATION,                     Weber, J.
     Plaintiff,                  Litkovitz, M.J.

    vs.

U.S. BRONCO SERVICES, INC.,      **REPORT AND RECOMMENDATION**[1]
    Defendant.

Plaintiff United Communications Corporation ("UCC") commenced this diversity action

pursuant to the Ohio Uniform Fraudulent Transfer Statute seeking redress for an alleged

fraudulent transfer of funds from non-party AMR International, Inc. ("AMRI") to defendant U.S.

Bronco Services, Inc. ("USBS"). (Docs. 1, 19). USBS has asserted counterclaims against UCC

for breach of contract and breach of warranties. This matter is now before the Court on UCC's

motion for summary judgment seeking relief on its fraudulent transfer claim and dismissal of

USBS's counterclaims (Doc. 22), USBS's memorandum contra (Doc. 27), and UCC's reply

memorandum. (Doc. 29). UCC has filed proposed findings of fact and conclusions of law, which

USBS has highlighted as true, false or irrelevant. (*See* Docs. 23, 28).

### I. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the court

demonstrates that there is no genuine issue as to any material fact and that the movant is entitled

to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *see also Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). The Court must evaluate the evidence and all inferences drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Satterfield v. Tennessee,* 295 F.3d 611, 615 (6th Cir. 2002); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323-24. The moving party need not support its motion with evidence disproving the opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex Corp.,* 477 U.S. at 325). Nor must the Court search the entire record for material issues of fact. *Street*, 886 F.2d at 1479-80. The court need only determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

-2-

## II. FACTS

Plaintiff UCC was a distributor of radio components for automatic water meter reading systems. Its product was branded as the "Eagle." (Doc. 22, Otwell Aff. at ¶ 7).

AMRI was a business that sold automatic water meter reading systems to utility companies, municipalities, and others. (Doc. 22, Otwell Aff. at ¶ 6). These systems were made up of various components working together to read meters remotely via radio communication, eliminating the need for field personnel to access the meters in order to manually record readings. (Doc. 22, Otwell Aff. at ¶ 6). Joseph Kulifay was the sole shareholder of AMRI, and Pat Flower and Mickey Jordan were responsible for the day-to-day operations of the business. (Doc. 27, Kulifay Decl. at ¶¶5-6; Doc. 28, Undisputed Finding of Fact A.4).

USBS is a company that has installed automatic meter reading systems since 1999. (Doc. 27, Kulifay Decl. at ¶3; Doc. 22, Grant Dep. p. 20). Joseph Kulifay is the sole shareholder of USBS. (Doc. 27, Kulifay Decl. at ¶2).

UCC and AMRI entered into a written Distribution Agreement on December 13, 2004. (Doc. 22, Otwell Aff., Ex. 1). USBS was not a party to the Distribution Agreement between AMRI and UCC. The Distribution Agreement states that "UCC has a license to make and have made, use, sell, lease and distribute certain automated meter reading devices for all types of utilities," and that UCC granted "to AMRI the exclusive and nontransferable right and license to market and sell those meter reading devices." (*Id.* at p. 1). The Agreement was for an initial 5-year term (ending December 13, 2009), subject to automatic renewal for 3 additional 5-year terms. (*Id.* at ¶8(a)-(b)). Section 6 of the Distribution Agreement prohibited AMRI from selling competitive products. *Id.* Under the Agreement, AMRI agreed to pay UCC the principal amount

-3-

of $48,484.89 plus interest at 7% per annum. (Doc. 22, Otwell Aff. at ¶5, Ex. 1).

From time to time, AMRI would submit and UCC would accept purchase orders for Eagle radio equipment. As goods were shipped to fulfill purchase orders, UCC issued invoices to AMRI. (Doc. 22, Otwell Aff. at ¶8).

Joseph Kulifay was the sole shareholder of AMRI, USBS, and non-party Bronco Excavating, Inc. (Doc. 22, Kulifay Dep. pp. 14, 17, 18-19, 22-23). These companies operated out of the same offices located in Fairfield, Ohio. Kelly Grant is an employee of Bronco Excavating who performed internal bookkeeping functions for all three companies since 2006. (Doc. 22, Grant Dep. pp. 15-16, 18-19, 22, 38). Grant testified that AMRI used USBS as an open line of credit for AMRI's business purposes and that "as [AMRI] needed money they borrowed money" from USBS. (Doc. 22, Grant Dep. p. 39). Kulifay was the only individual authorized to sign checks, transfer funds, issue purchases orders, or make any other financial decision with respect to AMRI, USBS, and Bronco Excavating. (Doc. 22, Grant Dep. pp. 22-23, 26-29; Kulifay Dep. pp. 35-36, 104-105).

In late 2006, non-party Johnson Controls, Inc. entered into an agreement with the City of Opa-locka, Florida, to provide an automatic meter reading system. Johnson Controls subcontracted with USBS to provide the necessary materials and install the equipment. (Doc. 27, Kulifay Decl. at ¶9 ). USBS contracted with AMRI for the purchase of water meters, registers, and radios. (Doc. 22, Grant Dep. pp. 57-59; KG Dep. Exh. 1). In turn, AMRI issued purchase orders to UCC for the radios. (Grant Dep. pp. 76-77, KG Dep. Exs. 14, 18). USBS provided advances through its open credit line to AMRI to purchase the UCC product. (Doc. 27, Kulifay Decl. at ¶10).

In May 2007, AMRI entered into an agreement with the North Brunswick Sanitary District in Leland, North Carolina, for the installation of an automatic meter reading system for the sum of $243,491.00. (*Id.* ¶11; Kulifay Dep. pp. 151-52 and Ex. 28). AMRI issued purchase orders to UCC for the radios at a cost in excess of $100,000.00 and subcontracted the installation work to USBS. (Doc. 22, Grant Dep. pp. 84-85; Kulifay Dep. pp. 153; Doc. 27, Kulifay Decl. at ¶12). USBS provided advances to AMRI to purchase the UCC product. (Doc. 27, Kulifay Decl. at ¶12).

Kulifay asserts that problems with UCC's Eagle radio product arose on both the Opa-locka and North Brunswick Projects. (Doc. 27, Kulifay Decl. at ¶13). The radios malfunctioned and replacements were obtained and tested. (Doc. 27, Kulifay Decl. at ¶¶15-16). North Brunswick withheld payment from AMRI until satisfied with the product. (Doc. 27, Kulifay Decl. at ¶17).

Upon completion of the installation of the meter reading system, North Brunswick issued a check dated June 11, 2008, to AMRI in the amount of $240,735.00. The check noted that the payment included the amount of $104,472.00 due UCC for radio equipment utilized in the project. The balance of $136,263.00 was attributable to the labor supplied by AMRI and/or USBS. (Doc. 22, Grant Dep. pp. 91-93; Grant Dep. Exs. 29 & 30).

UCC asserts that as of July 16, 2008, AMRI owed UCC the principal sum of $133,178.68 for merchandise sold and shipped and over $100,000.00 of that amount was attributable to the North Brunswick project. (Doc. 22, Otwell Aff. ¶10). UCC further claims that AMRI was indebted to it under the Distribution Agreement in the principal amount of $48,484.89. (Doc. 22, Otwell Aff. ¶ 5).

-5-

On July 17, 2008, AMRI transferred $263,000.00 to defendant USBS. (Doc. 28, Undisputed Finding of Fact A.1). It is undisputed that Joseph Kulifay was the sole shareholder of both AMRI and USBS at the time of the transfer. (Doc. 28, Undisputed Findings of Fact A.4 and 5). The transfer of $263,000.00 was applied against an antecedent debt owing to USBS by AMRI. (Doc. 28, Undisputed Finding of Fact A.6).

Kulifay asserts that the replacement product UCC provided for the Opa-locka project did not function properly and in the summer of 2008, USBS was forced to purchase and install different replacement products from another manufacturer. (Doc. 27, Kulifay Decl. at ¶18).

On August 26, 2008, UCC commenced legal action against AMRI in the Circuit Court of Pulaski County, Arkansas, to enforce the debts owed under the Distribution Agreement and to collect amounts owed for merchandise purchased by AMRI. Defendant USBS was not a party to this action. The matter was removed to the United States District Court for the Eastern District of Arkansas. *See UCC v. AMRI*, No. 4:08cv03004 (E.D. Ark.).[2] Defendant AMRI answered the complaint and counterclaimed against UCC for breach of warranty for the sale of allegedly defective products and for breach of the exclusivity provisions of the Distribution Agreement, alleging UCC sold devices to a third party in violation the Agreement. The case was actively litigated through counsel for AMRI for nearly one year before counsel moved to withdraw on July 13, 2009. (Doc. 27, Kopf Decl. at ¶ 11). The Arkansas court granted the motion and ordered AMRI to obtain substitute counsel within 60 days because a corporation may not appear

---

[2]"Federal courts may take judicial notice of proceedings in other courts of record." *Rodic v. Thistledown Racing Club, Inc.,* 615 F.2d 736, 738 (6th Cir. 1980)(quoting *Granader v. Public Bank*, 417 F.2d 75, 82-83 (6th Cir. 1969)). *See also Lyons v. Stovall,* 188 F.3d 327, 333 n.3 (6th Cir. 1999); *Saint Torrance v. Firstar*, 529 F. Supp.2d 836, 838 n.1 (S.D. Ohio 2007).

*pro se. Id.* at ¶ 12. AMRI failed to retain counsel within 60 days. The court then ordered AMRI to show cause why the court should not strike AMRI's answer and enter default judgment against AMRI for not complying with the court's previous order to obtain substitute counsel. (Doc. 27, Kopf Decl., Ex. 3). AMRI failed to respond to the show cause order and on October 16, 2009, the court entered judgment in favor of UCC for the total amount of $215,039.65. (Doc. 22, Otwell Aff., Ex. 2; Doc. 27, Kopf Decl., Ex. 4). The court also dismissed AMRI's counterclaims without prejudice for failure to prosecute. (Doc. 27, Kopf Decl., Ex. 4). UCC then filed a motion for reconsideration of the court's decision to dismiss AMRI's counterclaims "without" prejudice and requested the dismissal be "with" prejudice. (Doc. 27, Kopf Decl. at ¶ 15 and Ex. 4). On November 5, 2009, the Arkansas court granted UCC's motion, finding AMRI's continued and persistent failure to prosecute its compulsory counterclaim was "willful." The court ordered that "[t]he default judgment in this action bars AMRI from asserting this claim in a subsequent action" and dismissed AMRI's counterclaims "with prejudice." (Doc. 22, Otwell Aff., Ex. 3; Doc. 27, Kopf Decl. at ¶ 16 and Ex. 6). Thereafter, UCC obtained a judgment for attorney fees and costs for an aggregate judgment of $257,758.78 against AMRI. (Doc. 22, Otwell Aff. at ¶17 and Ex. 4). No payment or recovery of the judgment has been made. (Doc. 22, Otwell Aff. at ¶18).

UCC then filed the instant action seeking judgment against USBS based upon AMRI's allegedly fraudulent transfer of funds to USBS on July 17, 2008. UCC asserts that as a creditor of AMRI, UCC's claims arose before the alleged fraudulent transfer and, under the Ohio Uniform Fraudulent Transfer Act (UFTA), it is entitled to judgment in the amount of $257,758.78 from defendant USBS.

USBS asserts that it remains disputed whether AMRI is in fact liable to UCC. USBS further asserts that it has a complete defense to UCC's claim under Ohio Rev. Code § 1336.08. USBS has also asserted two counterclaims against plaintiff UCC for breach of contract and breach of warranties.

## III. SUMMARY JUDGMENT SHOULD BE GRANTED ON UCC'S CLAIM FOR A FRAUDULENT TRANSFER.

### A. There are no genuine issues of material fact on UCC's claim under Ohio Rev. Code § 1336.05(B).

Plaintiff UCC's claim arises under the Ohio UFTA, Ohio Rev. Code § 1336.01 *et seq.* The Act permits a creditor to challenge a debtor's transfer of property in specified circumstances and to avoid the transfer to the extent necessary to satisfy the creditor's claim. The instant case is governed by Section 1336.05(B) of the Act, which states:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the transfer was made to or the obligation was incurred with respect to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Ohio Rev. Code § 1336.05(B).

"Subsection (b) [of the UFTA] renders a preferential transfer–*i.e.*, a transfer by an insolvent debtor for or on account of an antecedent debt–to an insider vulnerable as a fraudulent transfer when the insider had reasonable cause to believe that the debtor was insolvent." Comment (2) to § 5 of the UFTA of 1984. (Doc. 29, Ex. 1). Section 5 of the UFTA is intended to prohibit a debtor from favoring one creditor over another in distributing assets to discharge an obligation if the debtor is insolvent at the time and the preference is to an insider. *See Prairie Lakes Health Care System, Inc. v. Wookey*, 583 N.W.2d 405, 413 (S.D. 1998) (citing *Textron*

*Fin. Corp. v. Kruger*, 545 N.W.2d 880 (Iowa Ct. App. 1996)). "The rationale behind § 5(b) 'is

that an insolvent debtor is obliged to pay debts to creditors not related to [the debtor] before

paying those who are insiders.' UFTA, Prefatory Note. This provision attempts to diminish the

unfair advantage insiders sometimes possess when they are familiar with the debtor's financial

substance." *Prairie Lakes Health Care System, Inc.*, 583 N.W.2d at 413.

     To establish a claim under this provision of the Ohio UFTA, a creditor must show: (1) the

creditor's claim arose before the transfer, (2) the transfer was made to an insider for an

antecedent debt, (3) the debtor was insolvent at the time of the transfer, and (4) the insider had

reasonable cause to believe that the debtor was insolvent. *Comer v. Calim*, 716 N.E.2d 245, 249-

50 (Ohio App. 1st Dist. 1998). Unlike a claim for common law fraud, when the statutory

elements of Ohio Rev. Code § 1336.05(B) are satisfied, fraud is imputed to the debtor. *Id. See

also Stewart v. R.A. Eberts Co., Inc.*, No. 08CA10, 2009 WL 2684497, at \*7 (Ohio App. 4th

Dist. Aug. 18, 2009). The remedies for a fraudulent transfer include the avoidance of the

transfer to satisfy the creditor's claim. *See* Ohio Rev. Code § 1336.07(A)(1).

     Pursuant to the fraudulent transfer statute, transfers are only fraudulent as to a creditor if

the transfer was made by a debtor. Ohio Rev. Code § 1336.05(B). The statute defines a

"creditor" as "a person who has a claim." Ohio Rev. Code. § 1336.01(D). A debtor is defined as

"a person who is liable on a claim." Ohio Rev. Code § 1336.01(F). A "claim" is defined as "a

right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

Ohio Rev. Code § 1336.01(C).

     Applying the statutory elements of § 1336.05(B) to this case, it is undisputed that UCC's

claim against AMRI arose before the transfer was made to USBS. (Doc. 28, Undisputed Finding of Fact A.3). It is also undisputed that AMRI's transfer was made to USBS, an "insider," for an antecedent debt. (Doc. 28, Undisputed Finding of Fact A.6, Undisputed Conclusion of Law B.3). "An insider includes, inter alia, directors, officers, partners, persons in control of a corporation, relatives and corporations of which the debtor is a director, officer or person in control." *In re Youngstown Osteopathic Hosp. Ass'n*, 280 B.R. 400, 411 (Bkrtcy. N.D. Ohio 2002) (citing Ohio Rev. Code § 1336.01(G)). Here, Mr. Kulifay is the sole shareholder of both USBS and AMRI. The evidence establishes that USBS applied the $263,000.00 against an antecedent debt owed by AMRI. (Kulifay Dep. JK Dep. Ex. 1). USBS does not dispute that it is an affiliate of AMRI and therefore an insider as defined by Ohio law. Therefore, the first two statutory elements are satisfied.

UCC also presents evidence showing that AMRI was insolvent at the time of the transfer. Under Ohio law, a debtor is insolvent if its liabilities exceed its assets. *See* Ohio Rev. Code § 1336.02(A)(1). Additionally, "[a] debtor who generally is not paying his debts as they become due is presumed to be insolvent." § 1336.02(A)(2). *See Aristocrat Lakewood Nursing Home v. Mayne*, 729 N.E.2d 768, 777 (Ohio App. 8th Dist. 1999). Here, UCC presents evidence showing that the liabilities of AMRI exceeded its assets.[3] AMRI is no longer in business. (Doc. 22, Grant Dep. pp. 22-23). Kulifay testified that AMRI may not have filed a tax return for 2009 due to lack of business activity. (Kulifay Dep. pp. 26-27). AMRI's sole salesperson resigned midsummer of 2008 and was not replaced. (*Id.* at 41, 56-58). Joseph Kulifay testified that AMRI owed USBS

---

[3] UCC asserts that the solvency of AMRI cannot be determined by reference to its balance sheet because, according to Kulifay, no one ever prepared a financial statement for the company. (Kulifay Dep., p. 25).

approximately $1.5 million, but he did not "think there's a million-and-a-half worth of

receivables." (*Id.* at 31; *see* also Doc. 25, Ex. 1). Kulifay further testified that AMRI's assets

consisted of accounts receivable and perhaps two or three laptop computers, but that such assets

were not worth $1.5 million. (*Id.* at 31-32). When asked whether AMRI's liabilities exceeded its

assets in July 2008, Kulifay testified, "I would say that based on the amount of monies owed and

the income stream coming in that there was less income or money in the bank than there was

owed." (*Id.* at 38).

Kulifay's testimony establishes that AMRI was insolvent at the time of the transfer and

USBS has not presented any evidence creating a genuine issue of fact on this issue. Although

USBS has identified the insolvency of AMRI as a disputed issue of fact in response to UCC's

proposed findings of fact (Doc. 28 at 2), USBS has failed to present any evidence contradicting

UCC's evidence that AMRI was insolvent at the time of the transfer. USBS may not rest on its

general denial of this fact, but must "present some significant probative evidence which makes it

necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp.*,

822 F.2d at 1435. USBS has failed to carry its burden on the insolvency element. Therefore, the

third element of § 1336.05(B) is met.

Finally, UCC presents evidence that USBS had reasonable cause to believe that AMRI

was insolvent. Joseph Kulifay was the sole shareholder of both AMRI and USBS. (Doc. 28,

Undisputed Findings of Fact A.4 and 5). AMRI used USBS as an open line of credit whenever

AMRI needed cash, and Kulifay was the only individual authorized to sign checks, transfer

funds, issue purchases orders, and make any other financial decision with respect to AMRI and

USBS. (Doc. 22, Grant Dep. pp. 22-23, 26-29, 39; Kulifay Dep. pp. 35-36, 104-105). USBS has

not presented any evidence creating a material issue of fact on this statutory element. Therefore, UCC has satisfied its burden to show that USBS had reasonable cause to believe AMRI was insolvent at the time of the transfer, and the fourth element of the Ohio fraudulent transfer statute is satisfied. Thus, unless USBS has a valid defense, UCC is entitled to avoid the transfer from AMRI to USBS to satisfy AMRI's debt to UCC.

### B. USBS's defenses are without merit.

USBS contends that UCC is not entitled to summary judgment on the fraudulent transfer claim because there are genuine issues of fact as to whether UCC qualifies as a "creditor" under the Ohio UFTA. USBS asserts that transfers are only fraudulent as to a "creditor" if the transfer was made by a "debtor." *See* Ohio Rev. Code § 1336.05(B) ("transfer made . . . by a *debtor* is fraudulent as to a *creditor* whose claim arose before the transfer was made. . . ."). USBS argues that there is a genuine issue of fact as to whether AMRI is a "debtor" under the Act because UCC has not shown AMRI is actually liable on UCC's claim against AMRI. (Doc. 27 at 13, citing *Mather Investors, LLC v. Larson*, 720 N.W.2d 575, 578 (Mich. App. 2006) ("A claim need not be reduced to judgment or undisputed. . . . However, the transferor must actually be liable for the claim to be a 'debtor.' Indeed, the remainder of the UFTA appears to presume that liability has already been established.")).

In support of its argument that UCC has not established that AMRI is a "debtor," USBS first asserts that no court has resolved the merits of UCC's claim against AMRI. USBS contends that the "default" judgment entered by the Arkansas District Court does not qualify as an adjudication on the "merits" of UCC's claim and cannot serve as the basis for UCC's fraudulent transfer claim in this case. (Doc. 27 at 13, citing *Williams v. Performance Diesel*, Case No.

-12-

14-00-00063-CV, 2002 WL 596414, at *3 (Tex. Ct. App. Apr. 18, 2002) ("Although a default judgment may sometimes be used to prove the truth of matters asserted when used against the non answering party (as an admission by silence), they cannot be used to prove the alleged matters against third parties.").   The Court disagrees.

In the Arkansas litigation, the district court entered a default judgment against AMRI based on its failure to comply with the court's order to obtain substitute counsel upon withdrawal of its counsel after one year into the litigation and its failure to respond to the court's show cause order.  "It is well established that courts have inherent power to dismiss and/or enter a default when a party disobeys a court order or otherwise interferes with the efficient administration of justice." *Smith v. C.I.R.,* 926 F.2d 1470, 1475 (6th Cir. 1991) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962); *Harris v. Callwood*, 844 F.2d 1254, 1255 (6th Cir. 1988)).  The Arkansas District Court entered a default judgment against AMRI only after AMRI failed to comply with the court's orders.  The default judgment obtained by UCC against AMRI in the Arkansas litigation establishes AMRI's liability as a matter of law on UCC's claim.  *See U.S. v. Conces,* 507 F.3d 1028, 1038 (6th Cir. 2007) ("upon the entry of a default judgment, [defendant's] liability was deemed to be established as a matter of law") (citations omitted); *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110-11 (6th Cir. 1995) (default admits defendant's liability).[4] *See also Brown v. Kenron Aluminum and Glass Corp.*, 477 F.2d 526, 531 (8th Cir. 1973) (citing *Riehle v. Margolies*, 279 U.S. 218, 225 (1929)) ("A judgment by default is as conclusive an adjudication of the issues for purposes of *res judicata* as a judgment rendered after

---

[4]Likewise, under Ohio law judgments entered by default are to be treated as if they had been fully adjudicated on the merits. *In re Stoddard,* 248 B.R. 111, 119 (N.D. Ohio 2000) (and Ohio cases cited therein).

-13-

a trial on the merits."). The final judgment entered by the Arkansas court in favor of UCC and against AMRI for the sum of $257,758.78 clearly establishes that AMRI is actually liable to UCC.

The *Williams* case cited by USBS in support of its position is factually and legally inapposite. In *Williams*, the creditor sought to recover funds under the Texas Uniform Fraudulent Transfer Act (TUFTA) based on an allegedly fraudulent transfer from an insolvent insurance company to the defendants. The issue in *Williams* involved *when* the claim of the creditor arose. The TUFTA provisions in *Williams* required the creditor to prove that the claim arose before the transfer. However, the creditor presented only the default judgment against the transferor debtors (obtained over five years after the alleged fraudulent transfer) and failed to present evidence of a timely claim that arose prior to the alleged fraudulent transfer. *Williams*, 2002 WL 596414, at * 3. The court in *Williams* determined that the default judgment established only that the creditor had a claim as of the date of the judgment, but not before.

Here, in contrast, there is no issue as to when UCC's claim arose. The parties have agreed that UCC's claim against AMRI arose before the transfer was made to USBS. (See Doc. 28, Undisputed Finding of Fact A.3: "The claim of UCC against AMRI arose before the transfer was made to USBS."). Likewise, the affidavit of Greg Otwell establishes that as of July 16, 2008, the day before AMRI transferred $263,000.00 to USBS, AMRI owed UCC the principal sum of $133,178.68 for merchandise sold and shipped. (Doc. 22, Otwell Aff. ¶10). Over $100,000.00 of that amount was specifically attributable to the North Brunswick project, and AMRI was also indebted to UCC under the Distribution Agreement in the principal amount of $48,484.89. (*Id.*, ¶ 5). Unlike *Williams*, there is no dispute as to whether UCC has a claim or

-14-

when such claim arose.

Nevertheless, USBS contends that UCC has not shown AMRI is actually liable on UCC's claim against AMRI for a second reason. USBS asserts that UCC initially breached the contract between UCC and AMRI by not providing conforming products and UCC's actions excused any further performance by AMRI under the contract.[5] USBS asserts that in addition to UCC's failure to produce conforming and properly functioning products, UCC breached the Distribution Agreement and its subsequent sales contracts by giving away the product rights, thereby excusing any further performance by AMRI.[6] Because liability is allegedly disputed, USBS maintains that UCC cannot establish that UCC is a creditor of AMRI.

The fact that UCC's claim may be disputed does not disqualify UCC as a creditor entitled to pursue its fraudulent transfer claim under Ohio law. A "disputed" claim is nevertheless a "claim" for purposes of the Ohio UFTA. *See* Ohio Rev. Code § 1336.01(c) (a "claim" is defined

---

[5]USBS asserts that problems arose with UCC's radio products on both projects. (Doc. 27, Kulifay Decl. at ¶¶13-14). Kulifay states that UCC's "Eagle WCU" radios were not reading the registers correctly. *Id.* at ¶15. The parties tried to work through the issues, and replacement products were sent and installed. *Id.* at ¶16. North Brunswick withheld payment from AMRI until it was satisfied with the product. AMRI did not receive payment until July 2008, at which point AMRI deposited the check and made payment to USBS for its installation work and in repayment on the open credit line. *Id.* at ¶17. Kulifay states that the replacement product UCC provided for the Opa-locka project did not functioning properly and USBS was forced to purchase and install different replacement product from another manufacturer in the summer of 2008. *Id.* at ¶18.

UCC, however, maintains that the radios it supplied were not defective. According to UCC, the problems with the Opa-locka and North Brunswick projects were that other components of the automatic-meter-reading system, notably the meters and registers, were not compatible with the radios. (Doc. 29, p. 13, n. 1). UCC asserts it was not responsible for selecting the meters or registers. *Id.* UCC further asserts that North Brunswick did remit payment to AMRI and that such payment accounts for the bulk of the alleged fraudulent transfer by AMRI to USBS.

[6]USBS asserts that UCC entered into a settlement agreement with another company that originally developed the Eagle radio product in September 2007. The agreement provided, *inter alia*, that UCC would have the right to manufacture and distribute the radio product only until September 6, 2008, which is more than a year before the end of AMRI's initial 5-year term granting it the exclusive right to distribute the product. (Doc. 27, Kopf Decl. ¶¶3-4 and Exs. 1, 2). Thus, USBS asserts that UCC breached the Distribution Agreement with AMRI by giving away the product rights without AMRI's consent. UCC, however, maintains that Pat Flowers, acting president of AMRI, was consulted regarding the settlement agreement, and he agreed that the settlement agreement was in the best interests of AMRI.

as a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured, or unsecured") (emphasis added).

More importantly, AMRI raised these issues in its counterclaims against UCC in the Arkansas litigation. AMRI asserted counterclaims for breach of contract relating to the devices sold by UCC to AMRI, breach of warranty regarding the devices supplied by UCC, and breach of the UCC/AMRI Distribution Agreement, and for judgment declaring that AMRI owed nothing to UCC. (Doc. 22, Kulifay Dep., JK Dep. Ex. 38, pp. 4-7). These counterclaims were dismissed with prejudice by the Arkansas District Court and may not be relitigated by AMRI in the Southern District of Ohio or in any other court because they are precluded by *res judicata*.

Under the doctrine of *res judicata*, or claim preclusion, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, n.5 (1979); *Gargallo v. Merrill Lunch, Pierce, Fenner & Smith*, 918 F.2d 658, 660-61 (6th Cir. 1990). The doctrine of claim preclusion protects against "the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. U. S.*, 440 U.S. 147, 153-154 (1979). Claim preclusion prevents "not only relitigating a claim previously adjudicated; it also precludes litigating a claim or defense that should have been raised, but was not, in the prior suit." *Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir. 2003) (citing *Stern v. Mascio*, 262 F.3d 600, 608 (6th Cir. 2001)); *Gargallo,* 918 F.2d at 660-61. *See also Federated Department Stores, Inc., v. Moitie*, 452 U.S. 394, 398 (1981) (claim preclusion prevents the "relitigating of issues that were or could have been raised in [a prior]

-16-

action."). It is well-established that a default judgment is considered a judgment on the merits

and operates as *res judicata*. *Morris v. Jones*, 329 U.S. 545, 550-51 (1947); *Riehle v. Margolies*,

279 U.S. 218, 225 (1929).[7]

In this case, whether AMRI was absolved from liability because of UCC's alleged

breaches of contract, warranty, and the Distribution Agreement has already been decided by the

Arkansas litigation against AMRI. Whether UCC breached the UCC/AMRI contract is no longer

in dispute by virtue of the Arkansas District Court's judgment against AMRI on its

counterclaims. AMRI's counterclaims against UCC were dismissed "with prejudice" and cannot

be re-asserted by AMRI in any subsequent action to contest its liability. *See Orca Yachts, L.L.C.*

*v. Mollicam, Inc.*, 287 F.3d 316, 319 (4th Cir. 2002) (default judgment has claim preclusion

effect as to all claims or counterclaims in the proceeding) (citing *Wood v. Several Unknown*

*Metrop. Police Officers*, 835 F.2d 340, 343-44 n.9 (D.C. Cir. 1987)).[8] Neither AMRI nor USBS

can now contest the merits of *AMRI's* counterclaims in this or any other proceeding. Thus,

AMRI's liability is established and AMRI is a "debtor" under the Ohio UFTA for purposes of

UCC's fraudulent avoidance claim.

---

[7]The reasoning behind this rule has been explained as follows:

> In one aspect, default judgments afford an opportunity to surrender without incurring the costs of litigation, either because the claim is thought valid or because the cost of litigation seems greater than the probability and rewards of success. Plaintiffs could not afford to accept this surrender if the resulting judgment were not final. Denial of preclusion would force unwanted and often one-sided litigation that both parties would prefer to avoid. In another aspect, default judgments provide the sanction that compels defendants to play the game and abide by the rules. Claim and defense preclusion are necessary to make the sanction effective.

18A Wright, Miller & Cooper, Federal Practice and Procedure § 4442 at 236 (2d ed. 2003).

[8]*See also Liadis v. Fekos*, No. 91-3184, 1991 WL 203754, at *2 (6th Cir. Oct. 7, 1991) (recognizing *res judicata* effect for compulsory counterclaims under Ohio law).

Next, USBS asserts that even assuming UCC has established that the transfer was fraudulent, UCC is not entitled to summary judgment because USBS has a complete defense to this claim under Ohio Rev. Code § 1336.08(C). Ohio Rev. Code § 1336.08(C) provides in relevant part:

> Notwithstanding the voidability of a transfer or an obligation under division (A)(1) of section 1336.07 of the Revised Code, a good faith transferee or obligee is entitled, to the extent of the value given to the debtor for the transfer or obligation, to a reduction in the amount of the liability on the judgment.

Ohio Rev. Code § 1336.08(C)(3).

USBS asserts that it gave fair value to AMRI, well in excess of the amount of the transfer, because it performed $152,155.00 in installation work on the North Brunswick job for AMRI and advanced over $1.4 million to AMRI under the open credit line. (Doc. 27, Kulifay Decl. at ¶¶ 25-26). Those services and loans were extended and completed before the transfer. *Id*. USBS maintains that there is no indicia of bad faith, it was simply paid for work performed on the New Brunswick project as a subcontractor for AMRI, and it was also repaid for money previously advanced to AMRI.

The issue is whether USBS was a "good faith" transferee under the statute for purposes of a § 1336.08(C) defense. Section 1336.01 does not define "good faith." Good faith is determined on a case-by-case basis based on what the transferee objectively knew or should have known about the solvency of the transferor at the time of the transfer:

> [T]he courts look to whether the transferee objectively 'knew or should have known' instead of examining the transferee's actual knowledge from a subjective standpoint. In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.

*In re Grove-Merritt*, 406 B.R. 778, 810 (Bkrtcy. S.D. Ohio 2009)[9] (citing *Brown v. Third Nat'l*

*Bank ( In re Sherman )*, 67 F.3d 1348 (8th Cir. 1995) (citing *In re Roco Corp.*, 701 F.2d 978, 984

(1st Cir. 1983)). Comment (4) to Section 8 of the UFTA provides:

> An insider who receives property or an obligation from an insolvent debtor as
> security for or in satisfaction of an antecedent debt of the transferor or obligor is
> *not a good faith transferee* or obligee if the insider has reasonable cause to believe
> that the debtor was insolvent at the time the transfer was made or the obligation
> was incurred.

UFTA § 8(d), Comment 4. (Doc. 29, Ex. 1) (emphasis added). *See also Putman v. Stephenson*,

805 S.W.2d 16, 20 (Tex. App. 1991) (insider transferee who knows transferor is insolvent at time

of transfer cannot be good faith transferee).

In this case, USBS has failed to present evidence creating a genuine issue of fact as to

whether it was a good faith transferee at the time AMRI transferred the funds. It is undisputed

that USBS was an "insider" relative to AMRI. (Doc. 28, Undisputed Conclusion of Law B.3).

USBS has not presented any evidence that calls into question evidence showing that AMRI was

insolvent at the time of the transfer. Joseph Kulifay was the sole shareholder of both USBS and

AMRI at the time of the transfer and, therefore, USBS had reasonable cause to believe AMRI

was insolvent at the time of the transfer. Accordingly, USBS may not be considered a good faith

transferee under § 1336.08(C).

For these reasons, the Court determines that UCC's motion for summary judgment on its

fraudulent transfer claim should be granted.

---

[9]The fraudulent transfer provisions of the Bankruptcy Code and the Ohio UFTA are substantially similar both in terms of rights, remedies, and defenses. *In re Grove-Merritt*, 406 B.R. 778, 789 (Bkrtcy. S.D. Ohio 2009). Therefore, findings made under the Code are applicable to actions under the Ohio UFTA. *Id.*

## IV. USBS'S COUNTERCLAIMS ARE BARRED BY CLAIM PRECLUSION.

USBS asserts two counterclaims against UCC for breach of contract and breach of warranties relating to contracts to which USBS claims to be a third-party beneficiary based on UCC's alleged failure to provide conforming, non-defective, merchantable, and fit meter reading devices. UCC asserts that USBS's counterclaims are barred by the doctrine of *res judicata*, or claim preclusion, because AMRI previously asserted the same claims in the Arkansas litigation, such claims were dismissed with prejudice, and USBS is in privity with AMRI. USBS maintains that claim preclusion does not bar its counterclaims because there has been no final decision on the merits, USBS is not asserting the same claims as AMRI, and USBS is not in privity with AMRI.

As explained above, claim preclusion may bar a second suit involving the same parties or their privies based on the same cause of action. *Parklane Hosiery*, 439 U.S. at 326, n.5. The Sixth Circuit follows the majority rule that federal claim preclusion principles, rather than state law principles, apply in successive federal diversity actions. *J.Z.G. Resources, Inc. v. Shelby Insurance* Co., 84 F.3d 211, 214 (6th Cir. 1996). The party asserting the defense of claim preclusion bears the burden of proof. *TolTest, Inc. v. North American Specialty Ins. Co.*, 362 F. App'x 514, 516-517 (6th Cir. 2010) (citing *Winget v. JP Morgan Chase Bank*, 537 F.3d 565, 572 (6th Cir. 2008)).

Claim preclusion is dependent upon the following elements: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action. *Bragg v. Flint Bd. of*

*Educ.*, 570 F.3d 775, 776 (6th Cir. 2009) (quoting *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 880 (6th Cir. 1997)). Application of these elements in the instant case shows that USBS's counterclaims are barred from relitigation under claim preclusion.

## A. Final decision on the merits

In the previous litigation, AMRI asserted four counterclaims: breach of contract regarding the devices sold by UCC to AMRI, breach of warranty regarding the devices supplied by UCC, breach of the Distribution Agreement, and a declaratory judgment that AMRI owed nothing to UCC. (Doc. 22, JK Dep., Ex. 38). After AMRI's counsel withdrew from the case and AMRI failed to retain substitute counsel, the Arkansas court struck AMRI's answer and dismissed its counterclaims against UCC without prejudice. Judgment was entered in favor of UCC on the same date. Thereafter, UCC filed a motion for reconsideration, asserting that AMRI's counterclaims should be dismissed with prejudice. AMRI failed to respond to the motion. The Arkansas court granted UCC's motion, stating:

> The Court finds AMRI's repeated failure to comply with this Court's Orders to be "willful." Further, AMRI's failure to contact the Court despite Orders to do so constitutes a continued and persistent failure to prosecute its Counterclaim. Additionally, the Court finds that AMRI's Counterclaim was a compulsory counterclaim which was required to be asserted and prosecuted in this action. The default judgment in this action bars AMRI from asserting this claim in a subsequent action. Accordingly, the Court finds that AMRI's Counterclaim against UCC should be, and hereby is, dismissed with prejudice.

(Doc. 22, Otwell Aff., Ex. 3) (internal citations omitted)

UCC contends that the Arkansas judgment and dismissal of AMRI's counterclaims in accordance with Rule 41(b) for lack of prosecution operates as a final decision on the merits of AMRI's counterclaims. USBS maintains that the AMRI's counterclaims were dismissed by default judgment and therefore the Arkansas court never entertained the merits of AMRI's

-21-

claims.

Although a default judgment does not result in the actual adjudication of any *issue* for purposes of *issue preclusion*, *see Arizona v. California*, 530 U.S. 392, 414 (2004), the question before the Court concerns claim preclusion.[10] The Arkansas court entered default judgment in favor of UCC with respect to its claims against AMRI. For the same reasons that the Arkansas court concluded that AMRI failed to defend itself on the complaint, the court also concluded that AMRI failed to prosecute its counterclaims in the case. Therefore, the court dismissed AMRI's counterclaims against UCC, with prejudice, for lack of prosecution. The dismissal for lack of prosecution is a final judgment on the merits with respect to AMRI's counterclaims. *See Bragg v. Flint Bd. of Educ.*, 570 F.3d 775 (6th Cir. 2009) (holding that, unless the order of dismissal says otherwise, a dismissal for failure to prosecute pursuant to Fed. R. Civ. P. 41(b) is an adjudication on the merits that should be given preclusive effect). *See also Brown v. Frey*, 806 F.2d 801, 803 (8th Cir. 1986) (a dismissal under Rule 41(b) operates as an adjudication on the merits). Therefore, the first element of claim preclusion–a final decision on the merits by a court of competent jurisdiction–is satisfied.[11]

### B. Issues litigated or should have been litigated and identity of the causes of action

The third and fourth elements of claim preclusion are related. *See Holder v. City of*

---

[10] "Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).

[11] A judgment by default may have *issue* preclusive effect only if the judgment expressly adjudicates an issue. *Arizona v. California*, 530 U.S. 392, 414 (2000). In contrast, *claim* preclusion, unlike issue preclusion, depends only on whether the court entered final judgment, not whether the parties actually litigated a particular claim covered by that judgment. *Id.*

*Cleveland,* 287 F. App'x 468, 470-71 (6th Cir. 2008). Both require an "identity of the causes of action," *i.e.*, "an identity of the facts creating the right of action and of the evidence necessary to sustain each action." *Id.* (quoting *Westwood Chemical Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981)). The "identity of the causes of action" or "identity of claims" element of claim preclusion is satisfied "if the claims arose out of the same transaction or series of transactions, or [if] the claims arose out of the same core of operative facts." *Browning v. Levy*, 283 F.3d 761, 773-74 (6th Cir. 2002) (internal quotation and citation omitted). Where claims arise from "the 'same transaction, or series of transactions,' the [party] should have litigated both causes in the first action and may not litigate the second issue later." *Holder*, 287 F. App'x at 471 (quoting *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 528 (6th Cir. 2006)).

A comparison of the complaints and counterclaims in both the Arkansas litigation and the instant case show that both arise out of the same transactions and core of operative facts. Both cases arise out of the December 13, 2004 Distribution Agreement between UCC and AMRI. In both cases, UCC sought to recover on the radio devices sold to AMRI for the Opa-locka and North Brunswick projects, while AMRI (in the Arkansas litigation) and USBS (in this case) counterclaimed for breach of contract and breach of warranties based on the allegedly defective equipment sold by UCC for use in such projects. In fact, AMRI's counterclaim in the Arkansas litigation alleged that *USBS* suffered damage as a result of UCC's allegedly defective devices, even though USBS was not a named party to the counterclaim. Thus, the current counterclaims against UCC "arise out of the same transaction" or "the same core of operative facts" as the Arkansas litigation. The transactions and facts that form the basis for AMRI's counterclaims in the Arkansas litigation are the same transactions and facts alleged by USBS in the instant

-23-

proceeding. As such, the third and fourth elements of claim preclusion are met here.

## C. Privity

In order for the dismissal of AMRI's counterclaims to have preclusive effect on USBS's counterclaims, USBS must be in privity with AMRI. For purposes of claim preclusion, there are three categories of privity: (1) successors in interest to a party will be bound by a judgment against that party; (2) a nonparty who controlled the original suit will be bound by the resulting judgment; or (3) a nonparty who is adequately represented by a party will also be precluded from relitigating the same issues. *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 422 (6th Cir. 1999). *See also Mitchell v. Chapman*, 343 F.3d 811, 823 (6th Cir. 2003). UCC asserts that privity exists between AMRI and USBS in this case under the second or third categories.

In *Living Care Alternatives of Kirkersville, Inc. v. United States*, 247 F. App'x 687 (6th Cir. 2007), a case discussed by both parties in support of their positions, two long-term nursing care facilities appealed the imposition of IRS tax levies against them. Both companies were owned by the same sole shareholder. The government sought to collaterally estop the second company from contesting its liability after the government obtained a judgment against the first company. The Sixth Circuit declined to extend privity under the second category, whereby a nonparty who controls the original suit is bound by the resulting judgment. The Court of Appeals acknowledged that the owner/sole shareholder of the first corporation was in privity with that corporation where the owner exercised complete ownership and control over the corporation. 247 F. App'x at 698. Yet, the Court declined to extend privity one step further to the second corporation owned by the same sole shareholder where the second "separate

-24-

corporation did not have a direct financial or proprietary interest in nor control over" the prior litigation involving the first corporation. *Id*. at 698.

The *Living Care* Court also declined to find privity under the third category–which binds a nonparty who is adequately represented by a party to the prior litigation–on the basis of the common ownership of sister corporations having similar business purposes. *Id*. The Court noted that the third category of privity articulated in *Becherer* requires either "an express or implied *legal* relationship in which the parties to the first suit are *accountable* to nonparties who file a subsequent suit raising identical issues" or the nonparty's express agreement to be bound by or acquiesce to a party's representation. *Id*. The Court of Appeals determined that while common ownership of sister corporations, without more, was insufficient to find privity on the record before the court, it was "possible that a more careful examination of the interests involved in this case could have demonstrated sufficient commonality of interests. . . ." *Id*. at 699.

Like *Living Care*, this case involves sister corporations with a common owner/sole shareholder. However, the evidence of a sufficient commonality of interests and financial interest in the prior litigation which was lacking in *Living Care* is present in the instant case. Joseph Kulifay was the sole shareholder and owner of both AMRI and USBS. AMRI and USBS operated out of the same offices located in Fairfield, Ohio. Kulifay was the only person authorized to write checks, authorize purchase orders, transfer funds, and make any other financial decision for both AMRI and USBS. Significantly, Kulifay used USBS as an open line of credit for AMRI to purchase UCC's product. USBS provided advances to AMRI through its open credit line to purchase the UCC device for both the Opa-locka and North Brunswick projects. USBS was the real party in interest as it provided the funds to purchase the allegedly

-25-

defective devices from UCC giving rise to the counterclaims raised by both AMRI in the

Arkansas litigation and USBS in this case. USBS had a direct financial interest in the prior

Arkansas litigation as any money recovered by AMRI on its counterclaims would, in reality, have

inured to the benefit of USBS to enable AMRI to repay its outstanding debt to USBS. In

addition, both USBS and AMRI's legal interests are aligned. In the Arkansas litigation, *both*

USBS and AMRI claimed to be damaged by UCC's malfunctioning equipment and UCC's

breach of the Distribution Agreement, despite the fact that USBS was not named a party to the

counterclaim. Also, both AMRI and USBS shared the same legal counsel. *Cf. In re Vision*

*Service Plan Litigation*, No. 09-1829, 2010 WL 2572076, at *9 (S.D. Ohio June 22, 2010)

(holding that the legal interests of a company and subsidiary were aligned and the parties were in

privity, noting that the company and subsidiaries shared the same legal counsel and citing cases

holding that privity existed between a parent company and subsidiary when they shared legal

counsel and corporate officers).

  The undisputed facts show that the intertwined financial and business relationships

between USBS and AMRI through Kulifay were such that there was a sufficient commonality of

interests between AMRI and USBS to bind USBS to the original judgment. In addition, the

Court determines that the interests of USBS and AMRI were so in line that AMRI's

representation in the prior litigation effectively represented the interests of USBS. Accordingly,

the Court determines that USBS was in privity with AMRI. Therefore, all the elements of claim

preclusion are satisfied in this case, precluding the relitigation of the counterclaims. Summary

judgment should be granted for UCC on USBS's counterclaims.

-26-

## IT IS THEREFORE RECOMMENDED:

1.  UCC's motion for summary judgment seeking relief on its fraudulent transfer claim and dismissal of USBS's counterclaims (Doc. 22) should be **GRANTED**.

2.  This matter should be dismissed with prejudice on the docket of the Court.

Date: 2/8/2011

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

UNITED COMMUNICATIONS
CORPORATION,
　　　　Plaintiff,

Case No. 1:09-cv-478

vs.

Weber, J.
Litkovitz, M.J.

U.S. BRONCO SERVICES, INC.,
　　　　Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).