**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**UNITED COMMUNICATIONS CORPORATION,**

        **Plaintiff**

**v.**                        **Case No. 1:09-cv-478-HJW**

**U.S. BRONCO SERVICES, INC.,**

        **Defendant**

**ORDER**

      This matter is before the Court upon the plaintiff's motion for summary judgment (doc. no. 22), which defendant opposes.  Plaintiff ("UCC") has filed proposed findings of fact and conclusions of law (doc. no. 23) which defendant ("USBS") has highlighted as true, false, or irrelevant (doc. no. 28). The Magistrate Judge entered a Report and Recommendation (doc. no. 34) recommending that summary judgment be granted to UCC and that USBS' counter-claims be dismissed. Defendant filed two written objections with multiple sub-parts (doc. no. 35) and a supporting brief (doc. no. 36), and plaintiff responded (doc. no. 37).  On May 10, 2011, this Court held a hearing at which respective counsel presented oral arguments.  Upon *de novo* review, and having fully considered the record, the Court will <u>decline</u> the recommended conclusions of the  Report and Recommendation and <u>deny</u> the motion for summary judgment for the following reasons:

**I.  Background and Factual Allegations**

      Although the facts will be set forth as succinctly as possible, an overview of

the background of this case provides context that sheds light on the procedural posture of the parties' present claims.

<u>The Parties' Business Relationships and Municipal Projects</u>

UCC, a producer of wireless communication equipment, decided to venture into the remote water meter reading business in 2004.  UCC made (or arranged for the manufacture of) the "Eagle" radio components that allowed municipalities to read water meters remotely.[1]  USBS had installed this type of equipment since 1999. Mr. Joseph Kulifay, the owner of USBS, started a new company "AMR International" ("AMRI") with Mr. Mickey Jordan and Mr. Pat Flowers in order to distribute UCC's new "Eagle" product.  Mr. Kulifay was the sole shareholder of AMRI.  Both AMRI and USBS were based in Fairfield, Ohio;  UCC was based in Arkansas.

On December 13, 2004, UCC and AMRI entered into a "Distribution Agreement" for AMRI to be the exclusive distributor for five years for UCC's Eagle devices, subject to renewal for three additional five-year terms.  AMRI employed Jordan and Flowers to take care of AMRI's sales and daily operations.  AMRI had an open line of credit from USBS for conducting business and could use this line of credit whenever it needed operating funds (doc. no. 27, citing to Kulifay Decl.  ¶¶ 25-26, indicating USBS provided advances of over $1,400,00.00 to AMRI).

Under the "Distribution Agreement," AMRI could not sell any substantially

---

[1]**Some Eagle devices were assembled for UCC in Texas by Variosystems, Inc, but in 2006, UCC began assembling some of the devices at its facility in Missouri (doc. no. 27, citing May Depo. 60:3-24; Deposition of Leonardo F. Speno III 85:14-87:11 and Depo. Ex. E, attached as Exhibit D).**

equivalent devices for any other company, unless UCC approved.  The agreement also indicated that UCC had advanced unspecified "sums" to AMRI, and therefore, AMRI agreed that UCC "shall be entitled to withhold $2.00 each from any payment due AMRI for each unit sold until such time as UCC has collected $48,484.89 together with interest thereon at the rate of seven percent (7%) per annum from the date or dates of such advances" (doc. no. 20-1 at 4, ¶ 10).

Thereafter, USBS installed UCC devices purchased by or through AMRI for the cities of Opa-Locka (Florida) and Leland (North Carolina).  For the Opa-Locka project, USBS agreed to acquire and install the devices pursuant to a sub-contractor agreement with Johnson Controls, Inc.  USBS purchased UCC's product for the job through AMRI and advanced funds to AMRI for that purpose (doc. no. 27-1 at ¶ 10; see also, doc. no. 22 at 4, citing Grant Dep. at 57-59,  76-77 and Ex. 1, KG Dep. Exs. 14, 18).  Representatives  of UCC, USBS, and AMRI held a "kick-off" meeting at UCC's offices in Arkansas in 2006 for this project (doc. no. 27-1, citing Kulifay Decl. ¶ 7).

For the Leland project, AMRI contracted with the North Brunswick Sanitary District for installation of an automatic meter reading system and subcontracted the installation work to USBS (doc. no. 22 at 4, citing Kulifay Dep. at 153).  USBS advanced funds to AMRI to purchase the Eagle radio components from UCC (Id., citing Grant Dep. at 84-85, KG Dep. Ex. 22; Kulifay Dep. at 160-161; JK Dep. Exs. 29 and 30).

Both projects experienced problems with malfunctioning of the devices (doc.

no. 27-1, Kulifay Decl. ¶ 15).  USBS asserts that UCC's products were defective, and that USBS incurred damages by having to purchase working replacement devices elsewhere in order to finish the projects and by having to perform costly additional installation work (Id. at ¶¶ 18, 25).

<u>Related Litigation</u>

UCC sued the manufacturers/developers of the radio components and related technology, alleging that they had withheld technology from UCC that was  required for the "integration between the Product and other brands" and that UCC was entitled to "distribute the Product in its complete, intended, and most competitive form"(doc. no. 27, citing "Declaration of John B. Kopf, III, ¶ 3 and Decl. Ex. 1 at 6-7, attached as Ex. F").  Although UCC's 2004 Distribution Agreement with AMRI had disclaimed any warranty by UCC and indicated that Econet Networking Systems ("ENS") would be responsible for the warranty, UCC thereafter entered a Settlement Agreement on September 5, 2007 (the "Irwin Settlement") whereby UCC specifically agreed to be fully responsible for the warranty on the product (Id., citing to Knopf Decl. ¶ 4 and Ex. 2 at 7).

AMRI and USBS were not parties to the "Irwin Settlement" and were not advised or consulted about It, even though it affected UCC's responsibilities under the 2004 Distribution Agreement (doc. no. 27, citing Kulifay Decl. ¶ 19).  In fact, UCC essentially indicated in the 2007 "Irwin Settlement" that it would effectively terminate AMRI's exclusive rights on September 6, 2008, despite the fact that the 2004 Distribution Agreement granted AMRI exclusive distribution rights through

December 13, 2009 (doc. no. 27, Kopf Decl. ¶¶ 3-4, Exs. 1, 2). USBS indicates it learned of these settlement provisions through discovery in the present case.

<u>Further Developments Between AMRI and UCC</u>

As problems with the Eagle equipment developed in the Opa Locka and New Brunswick projects, the relationship between UCC, AMRI, and USBS deteriorated. In 2008, UCC attempted to convince AMRI to voluntarily terminate the exclusive 2004 Distribution Agreement (UCC had already indicated in the Irwin Settlement that it did not intend to honor the full term of the 2004 Distribution Agreement). AMRI (through Mr. Kulifay) did not agree to early termination and non-exclusive distributor status (doc. no. 27-1 at ¶ 22).

UCC then approached Pat Flowers, who had personally guaranteed payment of any amounts owing to UCC by AMRI as part of the 2004 Distribution Agreement. Although Mr. Kulifay contends that Flowers did not have authority to terminate the 2004 Distribution Agreement on behalf of AMRI, UCC obtained Flowers' signature on a document purporting to terminate the 2004 Distribution Agreement on July 24, 2008 (doc. no. 27-1, Kulifay Decl. ¶ 23). Shortly thereafter, Flowers quit his job with AMRI (Kulifay Dep. at 41, 56-58). Meanwhile, UCC had entered into an agreement with one of AMRI's competitors (ENS) to distribute and sell UCC's devices, which according to USBS, had been reconfigured with USBS' feedback after the failures at Opa Locka and New Brunswick.

North Brunswick withheld payment on its project until USBS had completed additional installation work with properly-working devices. After the project passed

inspection, North Brunswick issued a check to AMRI (its main contractor) for $240,735.00 on June 11, 2008. The check noted that this sum included $104,472.00 for the purchase of UCC devices and $136,263.00 for installation of the devices by AMRI/USBS (doc. no. 22, Grant Dep. at 91-93, Exs. 29, 30). This check was deposited in AMRI's bank account on July 16 or 17, 2008 (doc. no. 22 at 5, citing Grant Dep. at 93-96, KG Dep. Exs. 30 and 31; Kulifay Dep. at 48-50, JK Dep. Exs. 2 and 3). USBS indicates that, as the sub-contractor, it was entitled to be paid for its installation work on the North Brunswick project. USBS also contends that it was entitled to repayment for loans of operating funds advanced to AMRI on its line of credit with USBS. In July of 2008, AMRI owed $1,752,008.60 to USBS for previous advances (doc. no. 22 at 5, citing Kulifay Dep., JK Dep. Ex. 1). On July 18, 2008, AMRI paid $263,000.00 to USBS (doc. no. 28, Undisputed Finding of Fact A.6).

UCC contends that, at the time of the transfer, AMRI owed it $133,178.68 for merchandise sold and shipped and that over $100,000 of that sum was attributable to the North Brunswick project (doc. no. 22 at 5, citing Otwell Aff., ¶ 10). UCC also contends that AMRI owed $48,484.89 to UCC under the terms of the 2004 Distribution Agreement (Id., citing ¶ 5).

**Multiple Litigation Ensues[2]**

On July 30, 2008, AMRI and USBS filed suit against UCC in the Court of Common Pleas, Butler County, Ohio (see AMRI v. UCC, Ohio Case No. cv 2008 07

_____

[2]"Federal courts may take judicial notice of proceedings in other courts of record." Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. 1980); see also, Lyons v. Stovall, 188 F.3d 327, 333 n. 3 (6th Cir. 1999).

3370). In its complaint, AMRI asserted four claims against UCC (Claims #1, 3, 5, and 6) for breach of the 2004 Distribution Agreement, breach of contract, breach of warranty, and declaratory judgment.[3] USBS asserted two separate claims of its own against UCC for breach of contract as a third party beneficiary and breach of warranty (Claims #2 and 4). UCC removed the action to the United States District Court for the Southern District of Ohio (see AMRI v. UCC, Case No. 1:08-cv-591-SAS).

On August 26, 2008, UCC filed suit against AMRI in the Circuit Court in Pulaski County, Arkansas, for the amount due for the purchase of the Eagle devices for the North Brunswick project and for $48,484.89 (plus interest) allegedly due from AMRI on the 2004 Distributor Agreement. See UCC v. AMRI, Case No. 4:08-cv-3004 (E.D.Ark.). AMRI then removed the case to the United States District Court for the Eastern District of Arkansas. AMRI answered and asserted its counterclaims for breach of contract and breach of warranty. USBS was not a party to the Arkansas lawsuit.

On January 19, 2009, Judge Spiegel dismissed the Ohio case without prejudice for lack of personal jurisdiction over UCC. This left only the pending litigation between UCC and AMRI in Arkansas. On July 13, 2009, AMRI's counsel moved to withdraw from the Arkansas suit (Kopf Decl. ¶11). The court granted the motion and advised AMRI to obtain substitute counsel within 60 days because

---

[3]The complaint alleged that UCC had arranged for plaintiffs' competitor "EcoNet" to distribute UCC's radios as of September 2008 and that UCC had breached the exclusive agreement with AMRI in bad faith (See Case No. 1:08-cv-591-SAS, Complaint at ¶¶ 13, 14).

corporations may not appear *pro se*. After 60 days passed without an appearance by new counsel, the court ordered AMRI to show cause why the court should not strike AMRI's answer (and counterclaims) as a sanction for not complying with the order to obtain counsel.[4] AMRI did not respond, and on October 16, 2009, the Arkansas federal court struck AMRI's answer and dismissed the counter-claims without prejudice for failure to prosecute (doc. no. 22-2 at 18).[5] At this point, both the Ohio case and the counter-claims in the Arkansas litigation had been dismissed without prejudice and without any consideration of the merits of any underlying issues.

While AMRI was without counsel, UCC moved the Arkansas federal court to change its prior order to "dismissal with prejudice." The court deemed AMRI's lack of response "wilful" and entered a new order on November 5, 2009, dismissing AMRI's counterclaims with prejudice (doc. no. 22-2 at 15-16). On November 16, 2009, the court granted attorney fees of $40,758.90 and costs of $1,960.23 (doc. no. 22-2 at 18-19).

On July 10, 2009, UCC had returned to federal court in Ohio and filed the present lawsuit against USBS, alleging that AMRI's 2008 payment of $263,000.00 to USBS was a "fraudulent transfer" in violation of Ohio Rev. Code § 1336.05(B). USBS, through counsel, answered and asserted counterclaims against UCC for breach of

---

[4]By this time, Flowers and Jordan had left AMRI, and the company had ceased functioning.

[5]USBS points out that after the court struck the answer, there were no longer any counterclaims before the court.

contract as a third party beneficiary and breach of warranty. Essentially, USBS reasserted the same two claims from the initial Ohio case that was dismissed for lack of personal jurisdiction. Those two claims were not asserted in the Arkansas case, as USBS was not a party to that action.

After discovery in the present case, UCC sought summary judgment, contending that the statutory elements for its claim of fraudulent transfer pursuant to Ohio Rev. C. § 1336.05(B) had been met. UCC asserts that "[s]ince the value of the asset fraudulently transferred was $263,000.00, UCC is entitled to a judgment against USBS for the lesser amount of its judgment against AMRI, i.e., $257,758.78" (doc. no. 22 at 11). UCC further asserts that, based on the Arkansas judgment against AMRI, USBS' counterclaims are barred by res judicata.

On February 8, 2011, the Magistrate Judge entered a lengthy Report and Recommendation, recommending 1) that the plaintiff's motion seeking summary judgment on its fraudulent transfer claim and dismissal of USBS's counterclaims be granted, and 2) that this matter should be dismissed with prejudice (doc. no. 34 at 27). The Court observes that these two recommendations are inconsistent, as granting of summary judgment on plaintiff's claim would result in entry of judgment, not dismissal. In any event, having carefully considered the record, including the objections and response (doc. nos. 35-37), the Court finds that genuine disputes of material fact preclude summary judgment on UCC's fraudulent transfer claim, and that res judicata does not require dismissal of USBS' counterclaims for breach of warranty and/or contract.

## II.  Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

Amended Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed.R.Civ.P. 56(c)(1).

The Committee Notes explain that the "standard for granting summary judgment remain unchanged" and that amendment "will not affect continuing development of the decisional law construing and applying" the standard.   Fed.R.Civ.P. 56, Committee Notes at 31.

Under Rule 56, the party seeking summary judgment bears the initial burden of showing the absence of a genuine dispute of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (l986).  The district court must

construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  Id. at 587; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some "specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);  Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 200 (6th Cir. 2010).   In reviewing a motion for summary judgment, the court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Anderson, 477 U.S. at 251-52.

**III.  Analysis**

**A.  Whether UCC is Entitled to Summary Judgment on its Claim of Fraudulent Transfer**

In its Amended Complaint (doc. no. 19, ¶ 13), UCC alleges that AMRI fraudulently transferred $263,000.00 to USBS in 2008 in violation of Ohio Rev. C. § 1336.05(B), which provides:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the transfer was made to or the obligation was incurred with respect to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

UCC contends that it has satisfied all these elements, including that UCC was a creditor; that AMRI was a debtor;  that USBS and AMRI were affiliates (i.e., insiders); that funds were transferred from AMRI to USBS in partial payment of an antecedent

debt; that AMRI was insolvent at the time of the transfer; and that USBS had reasonable cause to believe that AMRI was insolvent (doc. no. 22 at 7-10).

USBS objects to the Magistrate Judge's recommendation that all these elements are met, including whether AMRI was "insolvent" at the time of the transfer for purposes of the statute (doc. no. 28 at Finding A.7; doc. no. 35 at Obj. 1-g). Although UCC points to evidence indicating that AMRI's liabilities exceeded its assets at the time of transfer, USBS points to its open line of credit for AMRI and the past course of business between the two companies (i.e. AMRI could obtain advances from USBS on an ongoing basis whenever it needed operating funds) (doc. no. 27-1, Kulifay Decl. ¶¶ 25-26).  Indeed, UCC has not shown any failure by AMRI to pay any other bills, other than the bill for UCC's allegedly defective equipment. Although UCC indicates that AMRI stopped doing business sometime in late 2008 or early 2009, this subsequent cessation of business does not by itself establish insolvency at the earlier time of transfer.  USBS explains that AMRI's revenue stream slowed in 2008 because UCC had ended AMRI's exclusive distributorship (see doc. no. 22-3 at 11 and "Irwin Settlement") and AMRI had lost its two employees in sales (Jordan and Flowers).

USBS also disputes whether AMRI is "liable" to UCC for product that did not work, and thus, whether UCC is a "creditor" with a "claim" for purposes of Ohio's law on fraudulent transfer  (see doc. no. 27 at 1, 13).  With respect to these elements, UCC relies heavily on the 2009 Arkansas judgment as proof that AMRI owed UCC money in 2008. The parties engage in lengthy arguments about the effect of the

Arkansas judgment and the intricacies of claim preclusion and issue preclusion. It is not necessary to be drawn into these arguments for purposes of summary judgment on the fraudulent transfer claim. The Magistrate Judge correctly noted in the Report that under Ohio law, a "claim" need not be reduced to judgment, and that a "disputed" claim is still a claim for purposes of Ohio Rev. Code § 1336.01(C). Certainly, at the time of transfer, UCC contended that AMRI owed it money for the purchase of merchandise, even if AMRI disputed this claim.

Genuine disputes of material fact remain for trial regarding USBS' statutory defenses under Ohio Rev. Code § 1336.08. For instance, Ohio Rev. Code § 1336.08(E) provides in relevant part that "[a] transfer is not fraudulent under division (B) of section 1336.05 of the Revised Code . . . (2) If made in the ordinary course of business or financial affairs of the debtor and the insider." Evidence of record indicates that North Brunswick had contracted with AMRI on its water meter project. After USBS (as sub-contractor) finished installing the devices, North Brunswick paid its AMRI by check, specifically indicating that $136,263.00 was payment for the USBS installation work (doc. no. 22, Grant Dep. at 91-93, Exs. 29, 30). According to USBS, AMRI deposited the check and then repaid some of the money previously advanced to it by USBS, including money advanced for the purchase of UCC components for the North Brunswick project.

Additional evidence of record indicates that AMRI had an open line of credit from USBS and that USBS had routinely advanced funds to AMRI for operating expenses and purchases of UCC devices. The bookkeeper's spreadsheet for AMRI

that year reflects multiple advances from USBS and at least one other loan repayment to USBS in the amount of $50,000.00 (doc. no. 25 at 1).  Thus, USBS has put forth evidence showing at least that genuine disputes of material fact exist as to whether AMRI's payment of $263,000.00 to USBS was "in the usual course of business for purposes of Ohio Rev. Code § 1336.08(E).  The evidence here is not "so one-sided" that either party must prevail on summary judgment as a matter of law. Andersonv, 477 U.S. at 251-52.

Additionally, USBS contends  (doc. no. 27 at 14) that even if the transfer were voidable, USBS would be entitled to a set-off, i.e. a reduction in the amount of  any liability, to the extent of the value given by USBS to AMRI for the transfer.  Ohio law provides that "[n]otwithstanding the voidability of a transfer or an obligation under division (A)(1) of section 1336.07 of the Revised Code, a good faith transferee or obligee is entitled, to the extent of the value given to the debtor for the transfer or obligation, to . . . .(3) A reduction in the amount of the liability on the judgment." Ohio Rev. Code § 1336.08(C)(3).  Although USBS's knowledge of AMRI's alleged insolvency could undermine the assertion of "good faith," the question of insolvency itself is not a settled matter for purposes of summary judgment.

With respect to "value given" for purposes of set-off under § 1336.08(C)(3), the evidence suggests that AMRI did in fact owe USBS the money it repaid on July 18, 2008. See, e.g., Individual Business Servs. v. Carmack, 2011 WL 1457133, *10 (Ohio App. 2 Dist. 2011) (finding that "Robert's legal obligation to pay the loan back to Fifth Third Bank is evidence that . . . [the] trustee received a reasonably equivalent value

in exchange for the transfer"and concluding that genuine issues of material fact existed regarding whether property was fraudulently transferred).

Ohio law provides that  "[v]alue is given for a transfer. . .  if, in exchange for the transfer . . . an antecedent debt is . . . satisfied ..." O.R.C. § 1336.03(A);  In re Hanson, 373 B.R. 522 (N.D.Ohio 2007); and see, e.g., In re Wilkinson, 196 Fed.Appx. 337, 344 (6th Cir. 2006) (finding that if the debt is reduced by the same amount paid, there is an exchange of reasonably equivalent value, and the transfer is not fraudulent).  "The focus should be on the overall effect on the debtor's net worth after the transfer." Id.  The AMRI spreadsheet indicates AMRI's debt load was reduced by the exact amount of the transfer (doc. no. 25 at 1).  See, e.g, In re Valley–Vulcan Mold Co., 5 Fed.Appx. 396, 397 (6th Cir. 2001) (observing that "[a] transfer made for fair consideration is fatal to a cause of action under §§ 1336.04–1336.06").   In light of genuine disputes regarding insolvency and the applicability of defenses under § 1336.08, summary judgment is not appropriate on the plaintiff's claim of fraudulent transfer.

## B.  USBS' Counterclaims for Breach of Contract and Warranty

USBS' has asserted counterclaims for breach of warranty and breach of contract as a third party beneficiary.  UCC's motion for summary judgment seeks dismissal of those claims based on the affirmative defense of "res judicata," also known as claim preclusion.  Under res judicata, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." Montana v. United States, 440 U.S. 147, 153 (1979).

The United States Supreme Court has explained that:

> Under the doctrine of claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." New Hampshire v. Maine, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Issue preclusion, in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. Id., at 748-749, 121 S.Ct. 1808. By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," these two doctrines protect against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

Taylor v. Sturgell, 553 U.S. 880, 892 (2008).  In Taylor, the United States Supreme Court held that federal common law determines the preclusive effect of a previous federal court judgment, and that in diversity cases, "federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." Taylor, 553 U.S. at 891, n. 4 (citing Semtek International Inc. v. Lockheed Martin Corp., 531 U.S. 497,  508 (2001)).  The "rendering court" here, as that term was used in Taylor, would be the Arkansas federal court.

Under Arkansas law,[6] "claim-preclusion bars re-litigation of a subsequent suit

---

[6]The parties cite Sixth Circuit precedent which is substantially similar.  See Bragg v. Flint Bd. of Educ., 570 F.3d 775, 776 (6th Cir. 2009) (holding that four criteria must be present for res judicata to apply:  1) a final decision on merits by a court of competent jurisdiction;  2) a subsequent action between the same parties or their privies;  3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and  4) an identity of the causes of action).

when: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies." Baptist Health v. Murphy, 2010 Ark. 358, --- S.W.3d ----, 2010 WL 3835844 (Ark. 2010). With respect to issue preclusion, the issue sought to be precluded must have been actually litigated. McClaran v. Traw, 2011 Ark. App. 198, --- S.W.3d ----, 2011 WL 811715 (Ark.App. 2011). "Issue preclusion may be asserted by a stranger to the first judgment, but the party against whom it is asserted must have been a party to the earlier action and must have had a full and fair opportunity to litigate the issue in that first proceeding." Id. While AMRI would certainly be barred from refiling the same claims, it is a different matter to assert that USBS, a non-party to the Arkansas action, should be entirely precluded from asserting its own claims here.

USBS' assertion finds some support in the Supreme Court's opinion in Arizona v. California. There, the United States Supreme Court held that "the general rule that issue preclusion attaches only 'when an issue of fact or law is actually litigated' . . .[i]n the case of a judgment entered by … default, none of the issues is actually litigated." Arizona v. California, 530 U.S. at 414 (quoting Restatement (Second) of Judgments § 27)). In the Arkansas case, AMRI's counterclaims were initially dismissed for lack of prosecution[7] and then dismissed again on

---

[7]Rule 41(b) provides that a dismissal for failure to prosecute "operates as an adjudication upon the merits." Fed.R.Civ.P. 41(b). While a dismissal for failure to prosecute is not, in fact, a decision on the merits of the claim, it functions as

reconsideration as a sanction, with no consideration of the merits of any underlying issues.

As to whether the present case is between the same parties or their "privies," it is undisputed that AMRI and USBS are different corporations, so "privity" would be the only way to satisfy this requirement. Essentially, UCC seeks dismissal of the counter-claims under an exception to the general rule that "a person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." Taylor, 553 U.S. at 892-93 (generally disapproving of "virtual representation" and observing that "the application of claim and issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have his own day in court"). The evidence of record does not establish that AMRI, as a defunct "sister" corporation, "adequately represented" USBS in the Arkansas suit. No special procedures protected the nonparty's interests, nor does any evidence of record demonstrate an understanding by the parties that the Arkansas counterclaims were brought in a representative capacity. Id. at 897.

As to whether both suits involve the same claim or cause of action, USBS asserts it is bringing its own separate claims that were not previously litigated. This assertion is buttressed by the fact that AMRI and USBS initially asserted separate claims in the prior Ohio litigation. Although only AMRI's claims were at issue in the

---

such for the purposes of claim preclusion. See 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4440 (2d ed. 2002).

Arkansas suit, UCC now argues that all of USBS' present claims are the "same" as AMRI's prior claims and are subject to res judicata. It is axiomatic that before res judicata may bar a subsequent action, the parties must be the same, and second action must be upon same cause of action or demand as the prior suit. <u>C.I.R. v. Sunnen</u>, 333 U.S. 591, 597 (1948).

The present case sits at the crossroads of claim and issue preclusion. On one hand, AMRI is bound by the Arkansas judgment on the claims and counterclaims raised in that suit. The assertion that UCC breached the contract with AMRI has been put to rest. The Arkansas judgment is a valid judgment against AMRI and has not been set aside. Neither AMRi or USBS is free to disregard it.

On the other hand, USBS explains that it suffered its own separate damages by incuring extra costs for the additional labor to replace defective components supplied by UCC and that USBS also paid for replacement product from another manufacturer on the Opa Locka project. These matters have never actually been litigated and may be based on different facts than AMRI's Arkansas counterclaims. USBS points out that warranty claims arising from an underlying contract may be held by different parties.

With respect to its counterclaims, USBS asserts that it is a third party beneficiary of the 2004 Distribution Agreement, which expressly indicated that Arkansas law would apply. Arkansas recognizes the "third party beneficiary" doctrine. <u>Fidelity & Cas. Co. of New York v. J. A. Jones Const. Co.</u>, 325 F.2d 605, 608- 609 (8th Cir. 1963); <u>Freer v. J. G. Putman Funeral Home, Inc.</u>, 195 Ark. 307, 111

S.W.2d 463.   Third parties may be beneficiaries of warranties, express or implied, and warranties extend to persons who may use, consume or be affected by the goods. See Ark.C.A. § 4-2-318.

Under Arkansas contract law, a contract may be construed as having been made for the benefit of a third party when it clearly appears that "such was the intention of the parties." Angelo Iafrate Const., LLC v. Potashnick Const., Inc., 370 F.3d 715, 720 (8th Cir. 2004); Howell v. Worth James Constr. Co., 535 S.W.2d 826, 828 (1976). "The third party does not have to be named in the contract, but the parties to the contract must have intended to confer a direct benefit upon the third party." Id. at 828-29 (citing Carolus v. Ark. L & P Co., 164 Ark. 507, 262 S.W. 330 (1924)). Construction contracts may include other contractors as third party beneficiaries. Little Rock Wastewater Util. v. Larry Moyer Trucking, 321 Ark. 303, 307, 902 S.W.2d 760, 763-64 (1995).

In construing the contract, courts may consider both the contract "as a whole" and the "undisputed context" in which the contract was concluded. Klein v. Arkoma Production Co., 73 F.3d 779, 785 (8th Cir. 1996). The evidence regarding the purpose of AMRI and the subsequent working relationship between AMRI, USBS, and UCC raises at least a permissible inference that USBS was intended to benefit from the 2004 Distribution Agreement and any applicable warranties.  Although the 2004 Distribution Agreement indicated that "EcoNet" was responsible for any warranty, UCC later expressly agreed to accept this warranty responsibility.  Notwithstanding the Arkansas judgment against AMRI, it appears that USBS retains a separate cause

of action for breach of warranty.

In <u>Aetna Ins. Co. v. Eisenberg</u>, 294 F.2d 301, 306 (C.A.Ark.1961), the Court of Appeals considered the defenses could be asserted against third-party beneficiaries and observed that: "[I]t is not at all correct to say that supervening defenses that would be good against the promisee are good also against the beneficiary. The right of the promisee and the right of the beneficiary . . . have separate lives of their own; and the vicissitudes that are met by the one do not necessarily affect the other. Thus, the promisee has power to discharge the promisor's duty to himself; but the power to discharge the promisor's duty to the third party is almost wholly lacking." (Quoting 4 Corbin, Contracts, § 818. pages 273-274, 276 (1951)).  If USBS' counter-claims are separate claims from AMRI's previous claims, there is no "identity of causes of action."

On the record presently before the Court, and given that USBS was not a party in the Arkansas litigation and given that USBS' present counterclaims were not raised or considered there, the Court does not at this time find the counterclaims subject to dismissal on the basis of res judicata.

Accordingly, upon *de novo* review, and pursuant to the foregoing, the Court rules that:

    1.  The defendant's objections are SUSTAINED insofar as the Report recommends entry of summary judgment on the fraudulent transfer claim and dismissal of the counterclaims;

    2.  the recommended conclusions of the Report and Recommendation (doc. no. 55) are DECLINED;

    3.  the "Motion for Summary Judgment" (doc. no.  22) is DENIED; and

**4. this case shall proceed to trial as scheduled.**

**IT IS SO ORDERED.**


                           **s/Herman J. Weber**
                    **Herman J. Weber, Senior Judge**
                    **United States District Court**